*U.S. Bank Nat'l Ass'n v. Breer et al.*, No. 717-10-12 Wncv (Tomasi, J., May 17, 2016).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## VERMONT SUPERIOR COURT

| | |
|---|---|
| SUPERIOR COURT<br>Washington Unit | CIVIL DIVISION<br>Docket No. 717-10-12 Wncv |

| | |
|---|---|
| U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association, as Trustee (s/b/m to LaSalle Bank National Association) as Trustee for Wells Fargo Home Equity Trust Mortgage Pass-Through Certificates, Series 2004-1,<br>  Plaintiff,<br><br>  v.<br><br>Bonnie Breer, CitiFinancial, Inc., and Occupants residing at 86 Porter Road in Cabot, Vermont,<br>  Defendants. | |

Opinion And Order On
Ms. Breer's Motion To Certify Class Action

This is a residential foreclosure action filed by Plaintiff U.S. Bank, N.A., in its capacity as Trustee for Wells Fargo Home Equity Trust Mortgage Pass-Through Certificates, Series 2004-1, against Ms. Bonnie Breer. U.S. Bank alleges that Ms. Breer has made no payments on her modified, fixed-rate mortgage loan since 2011. Ms. Breer filed a counterclaim alleging fraudulent nondisclosure, constructive fraud, and consumer fraud. She requests damages and a declaration that her note

and mortgage are unenforceable.  Before the Court is her motion to certify the common law fraud claims as a class action.[1]  U.S. Bank opposes class certification.

The Court held a hearing on the motion in February.  Based on the written submissions of the parties and the oral arguments, the Court concludes that Ms. Breer has failed to satisfy her burden of demonstrating commonality and predominance as contemplated by Vt. R. Civ. P. 23.  Her certification motion is denied.

1.    *Background*

Following a divorce, and with poor credit, Ms. Breer sought to refinance her mortgage loan.  She eventually did so with an adjustable-rate loan from Wells Fargo Home Mortgage, Inc. (WFHMI), in 2004.  According to the terms of the Note, the interest rate was fixed at 8.875% for the first two years.  Then, it would reset every six months on specified "change dates."  Each reset rate would be 7.5% plus the most recent six-month U.S. dollar-denominated LIBOR (London Interbank Offered Rate) published in the Wall Street Journal.  The first reset rate could not exceed 11.875%.  Thereafter, it could not exceed 14.875%.  It could never go below 8.875%, and it could never go up or down more than 1% after the first change date.  The terms of the loan permitted her to refinance or otherwise prepay without penalty after the first two years, at the time of the first rate reset.

---

[1] Ms. Breer has acknowledged that her statutory consumer fraud claim is inappropriate for class certification.

2

"LIBOR is an interbank lending rate that is commonly used as an index and for the settlement of various types of legal-financial contracts, including ARMs." Report of Timothy J. Riddiough, Ph.D. at 3 (filed Aug. 24, 2015). It is determined based on submissions from selected panel banks.[2] *Id*. at 7. A component of the relevant LIBOR is the six-month Treasury rate. *Id*. at 3. WFHMI has never been a panel bank. Bank of America, N.A., (BANA) was a panel bank at all times relevant to this case. *Id*. at 8.

Once Ms. Breer's loan was originated, WFHMI endorsed the Note in blank and assigned it to a trust, Wells Fargo Home Equity Trust Mortgage Pass-Through Certificates, Series 2004-1 (the Trust), where it was securitized with over 6,600 other residential mortgage loans from around the country.[3] WFHMI has acted as servicer for the Trust ever since. LaSalle Bank, N.A., was the original Trustee (and holder of the Note following securitization). In 2007, BANA acquired LaSalle Bank, and became the Trustee. In 2012, U.S. Bank, N.A., became the Trustee.[4]

Ms. Breer had the misfortune of taking on an adjustable rate mortgage indexed to LIBOR just as LIBOR began to increase. After her rate started to reset, her monthly payment increased substantially. She did not seek to refinance the

---

[2] A far more expansive explanation of LIBOR is available in the record but that it is unnecessary to recount all of the details here.

[3] Again, a far more expansive explanation of the origination and securitization process is available in the record but it is unnecessary to recount all of the details here.

[4] It bears noting that WFHMI, LaSalle, and BANA are not parties to this case.

3

loan. By 2009, she was in default. In May 2009, WFHMI modified her loan by adding the deficiency to principal and fixing the interest rate at 4.875%. The modification lowered her monthly payment considerably. Nevertheless, at some point in 2011, she quit making payments (including for taxes and insurance) and has made none since. It is this modified loan that is the subject of the foreclosure claim.

Ms. Breer alleges that the property that secures her loan sits within the spillway easement for the Marshfield dam, has flooded several times since her refinancing in 2004, is unmarketable, and that WFHMI breached some duty to so warn her in the course of her 2004 refinancing. She also alleges that WFHMI duped her into thinking that its closing lawyer actually was representing her, and that the lawyer pressured her into signing all of the loan documents without reading anything or understanding what she was agreeing to. Though some of these allegations are mentioned in passing in the certification briefing, they do not appear to be the focus of the class action request.

The common law claims for which she seeks class certification relate to increasing LIBOR rates that, in turn, caused her payment rates to increase. The alleged fraud asserted has several moving parts, which may be summarized generally as follows: (1) WFHMI should have warned her that a LIBOR-indexed, adjustable rate loan was predatory and otherwise inappropriate for her; (2) WFHMI knew or should have known that LIBOR was about to skyrocket because it was overwhelming financial markets with high-risk mortgage debt that the debtors

4

would never be able to pay back (and presumably should have so warned her); (3) BANA manipulated LIBOR so that it would be artificially increased on her (and other typical) change dates by its conduct as a LIBOR panel member; and (4) WFHMI knew all along that BANA and the other LIBOR panel members were manipulating LIBOR to her detriment, profited from that, and never so advised her. She proposes various agency law theories to attribute BANA's and WFHMI's alleged misdeeds to the Trust itself and to rebut U.S. Bank's claim that it is a holder in due course.

The nationwide class Ms. Breer proposes includes all persons with LIBOR-indexed loans that ever were assigned to the Trust. Only a total of five or six such loans relate to mortgages on Vermont properties, however. The many thousands of other such loans relate to properties in all other states.

2.        *Class Certification—Vt. R. Civ. P. 23*

As the Vermont Supreme Court has said, "class actions are intended to be of limited and special application, not to be casually resorted to or authorized. This is because, improperly used, they can seriously compromise many due process rights of those involved." *George v. Town of Calais*, 135 Vt. 244, 245 (1977); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2424 n.7 (2014) (Thomas, J., dissenting) (noting the "*in terrorem*" influence certification exerts on the class opponent). The burden of proof on a Vt. R. Civ. P. 23 certification motion is on the movant, Ms. Breer in this case. *See* William B. Rubinstein, Newberg on Class Actions § 7:20 (5th ed.) (WL updated Dec. 2015) [hereinafter, "Newberg"].

5

There are four prerequisites for a class action, "numerosity, commonality, typicality, and adequacy of representation." *Alger v. Dep't of Labor & Industry*, 2006 VT 115, ¶ 36, 181 Vt. 309, 327–28; Vt. R. Civ. P. 23(a). In other words: there must be enough members of the class to warrant a class action; the class members' claims must have issues of fact or law in common; the class representative's claim must be typical of those of the other class members; and the class representative's counsel must be capable of the undertaking.

If all of those prerequisites are satisfied, the certification question turns to whether one of the "more onerous conditions" of Vt. R. Civ. P. 23(b) also is satisfied. *Wright v. Honeywell Intern., Inc.*, 2009 VT 123, ¶ 9, 187 Vt. 123, 129. Subsection (b)(1) applies in situations where individual litigation would create incompatible standards for the class opponent or impair the rights of nonparties. Subsection (b)(2) applies to class-wide injunctive relief. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360–61 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. . . . [I]t does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."). Subsection (b)(3) generally applies when common issues of law or fact predominate over individual issues and proceeding as a class action is superior to allowing individual litigation to unfold on its own. Ms. Breer seeks certification pursuant Vt. R. Civ. P. 23(b)(3).

The additional requirements for certification under Vt. R. Civ. P. 23(b)(3) are

6

as follows:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

"These requirements reflect the fact that special caution must be exercised in class actions of this type because of the loose affiliation among the class members, which is thought to magnify the risks inherent in any representative action." 7A Charles Alan Wright, *et al., Federal Practice & Procedure: Civil 3d* § 1777 (WL updated Apr. 2016).

3.    *Analysis*

The Vt. R. Civ. P. 23 inquiry in this case is complicated at the outset by Ms. Breer's heavy focus on the broad courses of conduct alleged against BANA and WFHMI without detailing her claims with specificity, including by spelling out exactly how she believes the law applies to them and how nationwide classes could be crafted effectively to raise them. This makes the analysis a murkier endeavor than it ought to be.[5]

---

[5] Under Fed. R. Civ. P. 23(c)(1)(B), in certifying a class action, a court must be able to describe the classes and claims *with specificity*. Newberg § 7:28. The Vermont rule does not contain the same express provision as the federal rule, though it likely should be interpreted to the same effect because without that specificity, potential

7

In any event, the commonality and predominance requirements counsel strongly against certification in this case. It is insufficient for purposes of commonality to simply come up with some issue, however general, that the proposed class members' claims may have in common. As the United States Supreme Court has explained,

> What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers *apt to drive the resolution of the litigation.* Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–132 (2009) (emphasis added), quoted in *Wal-Mart Stores*, 564 U.S. at 350.[6]

Predominance complements commonality by testing "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "As the predominance test is meant to help courts identify cases in which aggregate treatment would be

---

class members cannot effectively determine whether to opt out of the class action. *See id.* In this case, even if the Court otherwise were inclined to grant certification, it would be hard-pressed to describe Ms. Breer's claims and the class or classes to which they apply with the requisite degree of specificity.

[6] The majority's treatment of commonality in *Wal-Mart Stores*, according to the dissent, improperly subsumed the predominance analysis. *See Wal-Mart Stores*, 564 U.S. at 376 (Ginsburg, J., dissenting). The distinction mattered in that case because, as the dissent posited, only a Fed. R. Civ. P. 23(b)(2) class was at issue, and there is no predominance requirement in that event. In this case, where commonality blends into predominance matters little, if at all, because both requirements apply. *See* 7A Charles Alan Wright, *et al., Federal Practice & Procedure: Civil 3d* § 1763 (WL updated Apr. 2016).

efficient, it focuses on the extent to which the issues in the cases are common as opposed to individual—the more common the issues, the more likely it is that the case will be processed efficiently in the aggregate; the less common the issues, the less likely efficient resolution will be furthered by aggregation." *See* Newberg § 4:49. "This is more of a qualitative than quantitative analysis." *Id*. § 4.50.

It's the Court's belief that individual issues would swamp any common ones if certification were granted in this case. To arrive at common issues, Ms. Breer describes (in briefing and in her expert reports) the objectionable conduct of BANA and WFHMI in very generalized terms. During some period in the course of her LIBOR-indexed loan, she asserts that LIBOR was artificially increased on change dates by LIBOR panel members, of which BANA was but one. Whatever BANA did wrong and whatever effect it may have had on LIBOR and any class member, WFHMI necessarily was aware of it, somehow profited from it, and never so advised the class members. It also engaged in myriad, discrete practices that, collectively, can be described as steering marginal mortgagors into predatory loans. Doing so directly harmed each mortgagor affected by any particular such practice and, in the aggregate, all of this destabilized the economy and caused LIBOR to skyrocket whereas otherwise it presumably would not have. All of this is attributable, via unconventional agency law theories, to the Trust and now prevents U.S. Bank from claiming holder in due course status. To the extent that it could make sense in the abstract to say that the class members have all of the above in common, the generality of Ms. Breer's assertions does little to demonstrate that proceeding as a

9

class action is likely to "generate common answers apt to drive the resolution of the litigation" rather than mire this case in individual issues.

Predominance has not been shown. Ms. Breer proposes two common law fraud claims for current or past mortgagors of property *in every state*.[7] She has not attempted to explain why the law of Vermont would apply to the lion's share of claims that are based on property in other states. Presumably, the tort and agency law of the state in which each such property exists would apply to claims arising out of loans secured by that property. *See* Restatement (Second) of Conflict of Laws §§ 145 (torts), 291 (agency); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985) ("[W]hile a State may . . . assume jurisdiction over the claims of plaintiffs [in a class action] whose principal contacts are with other States, it may not use this assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law. It may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a 'common question of law.'"). "The class proponent bears the burden of showing that application of substantive laws from multiple jurisdictions does not defeat predominance. *Courts have rejected certification when the proponent's choice of law analysis was insufficiently thorough.*" Newberg § 4:61 (emphasis added); *see also Amchem Products*, 521 U.S. at 624 (noting that "[d]ifferences in state law" can

---

[7] With so few mortgagors having anything to do with Vermont, a class limited to Vermont mortgagors would come nowhere near satisfying the numerosity requirement.

11

"compound the[] disparities" among class members for predominance purposes). Ms. Breer barely touches on the matter.

The Court has no basis for any conclusion that somehow only Vermont law would apply to all class claims, much less that the law of the many states is so similar that a class action makes sense, especially in light of the complicated and nuanced nature of the claims. This alone shows that the proposed class cannot be certified. *See* 7A Charles Alan Wright, *et al., Federal Practice & Procedure: Civil 3d* § 1780.1 (WL updated Apr. 2016) ("As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states.").

Numerous issues that probably would require claim-by-claim proofs are apparent, including at least the following: (1) the extent to which any mortgagor may or may not have relied on any representations or omissions and whether that reliance was justified; (2) precisely what those representations or omissions were; (3) whether the mortgagor worked with an independent mortgage broker as Ms. Breer did and whether and how that broker's conduct might affect liability to any particular claimant; (4) how liability may be affected by the individual terms of each loan, including the various change dates and prepayment terms; (5) whether, when, and how each loan was refinanced or modified; (6) what loan terms were predatory or inappropriate given each mortgagor's risk profile and goals; (7) whether the mortgagor refinanced, defaulted, or paid in full; and (8) the amount of damages

12

accruing to each mortgagor in relation to however any liability might eventually be established. Indeed, in light of the individual attention such claims typically require, class action status is often denied in cases alleging common law fraud. *See McHan v. Grandbouche*, 99 F.R.D. 260, 266-67 (D. Kan. 1983)

Additionally, as the events underlying the fraud purportedly took place in 2004-2006, *see* Supplemental Affidavit of John Summa at 21 n.50 (filed Oct. 15, 2015) (taking the position that the financial incentive to manipulate LIBOR up ended sometime in 2006), the class claims present substantial statute of limitations issues that also will likely need individual determination. Vermont's limitations statute *may* apply universally to the claims of all proposed class members. Compare the 1971 version of the Restatement (Second) of Conflict of Laws § 142 under which the Vermont statute would apply universally with the 1988 revision under which it would apply to Vermont claims only; *Marine Midland Bank v. Bicknell*, 2004 VT 25, ¶ 7, 176 Vt. 389, 393 (apparently endorsing the heavily criticized and then firmly rejected conceptualization of the matter in the 1971 version of the Restatement but without discussing the 1988 revision); *Unifund CCR Partners v. Jenkins*, No. 158-7-09 Oecv, 2009 WL 6565294, Decision Re: Defendant's Motion to Dismiss (Vt. Super. Ct. Nov. 10, 2009) (discussing this question and deferring to *Bicknell*, regardless of its rationale, as binding precedent). Or, if the Court were to adopt the 1988 approach, multiple statutes of limitations would apply.

13

In any event, even under the Vermont statute, the proper determination of when each class member's claims accrued, and hence whether they are barred, would depend on the specifics of the discovery rule as it applies to each party. As Ms. Breer herself points out, the discovery rule presents a question of fact. *See Pike v. Chuck's Willoughby Pub, Inc.*, 2006 VT 54, ¶ 18, 180 Vt. 25, 33 (2006) ("Determination of the date of accrual under the discovery rule is a factual issue that generally should be decided by the jury."). While limitations issues often can be determined on a classwide basis, the same is not always so for "torts that arise on discovery." Newberg § 4:57 n.4. This would be the case here. An inquiry into discovery would have to be undertaken for each claimant. In Ms. Breer's case, for example, she argues that, based on the discovery rule, she can bring this case because she claims to have learned of the alleged fraud just under six years before she filed her complaint.

In short, regardless whether Ms. Breer has properly established any common issues, she has completely failed to satisfy the predominance requirement. Rather than showing that a class action would be an efficient way to proceed, the prospect is that certification would result in the aggregation of thousands of claims that would, in significant measure, need to be litigated separately.

That determination leads the Court to conclude that Ms. Breer has also failed to establish that a class action is a superior vehicle to address the claims raised. Vt. R. Civ. P. 26(b)(3). While she notes that an individual plaintiff may have difficulty managing such claims, she is represented by experienced counsel who appears well

14

versed in the relevant issues, and has already retained an economic expert. She appears well prepared to prosecute her case. To the extent ongoing funding is a concern, the Court notes that proof of fraud has the potential for an award of punitive damages, and Ms. Breer's Consumer Protection Act claim has the potential for penalties and attorney's fees, 9 V.S.A. § 2461(b).

Lastly, Ms. Breer has not persuaded the Court that this jurisdiction has any meaningful connection to the alleged fraudulent activities such that allowing a national class action here would make sense. Only six Vermont loans out of many thousands nationally could even possibly fall within the class, and that number may actually be lower. Although Vermont will often suffer less numerous instances of harm based on its population, the existence of six potential plaintiffs indicates that Vermont, as opposed to other jurisdictions, has been only slightly impacted by the alleged fraud. Moreover, few, if any, of the alleged perpetrators of the fraud reside in Vermont, and few witnesses are located here. *See* Newberg § 4.71 (noting that concentrating the litigation in a particular forum may be "particularly appropriate when that court has already made several preliminary rulings, when a particular forum is more geographically convenient for the parties, [or] when other similar actions have been consolidated before the court").

## Conclusion

For the foregoing reasons, Ms. Breer's class certification motion is denied.

Dated this __ day of May 2016 at Montpelier, Vermont.

_____
Timothy B. Tomasi,
Superior Court Judge